IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TERRENCE L. BROWN, | |
| Plaintiff/Counter-Defendant, | |
| v. | No. 1:17-cv-01244 |
| SKYLINE FURNITURE MANUFACTURING, INC., | Judge Coleman |
| Defendant, and | Magistrate Judge Weisman |
| SEA PRODUCTS, INC., and TED WECKER, | |
| Defendants/Counter-Plaintiffs. | |

## DEFENDANTS' ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defendants Skyline Furniture Manufacturing, Inc. ("Skyline"), Sea Products, Inc. ("Sea Products"), and Ted Wecker ("Wecker"), through counsel, hereby submit the following for their Answer to the Complaint, Affirmative Defenses, and Counterclaims.

## ALLEGATION NO. 1:

Terrence L. Brown is and was at all relevant times a resident of Olympia Fields, Cook County, Illinois.

## ANSWER:

Admitted.

## ALLEGATION NO. 2:

Skyline Furniture Manufacturing, Inc. ("Skyline"), is an Illinois corporation with its primary place of business in Thornton, Cook County, Illinois. Skyline is a closely-held corporation in the business of furniture design and manufacture.

**ANSWER:**

Admitted.

**ALLEGATION NO. 3:**

SEA Products, Inc. is an Illinois corporation affiliated with Skyline, with its primary place of business in Thornton, Cook County, Illinois.

**ANSWER:**

Defendants admit that Sea Products is an Illinois corporation with its primary place of business in Thornton, Cook County, Illinois. Defendants deny that Sea Products is owned by Skyline and otherwise deny the allegation that Sea Products is an "affiliate" to the extent the allegation suggests Skyline owns Sea Products.

**ALLEGATION NO. 4:**

On information and belief, Ted Wecker is and was at all relevant times a resident of Chicago, Cook County, Illinois. Mr. Wecker presently holds the position of Skyline's CEO.

**ANSWER:**

Admitted.

**ALLEGATION NO. 5:**

Mr. Brown became employed by SEA Products beginning in 1993.

**ANSWER:**

Defendants admit that Terry Brown ("Brown") was employed by Sea Products from 2011-2014, but otherwise deny the allegations.

**ALLEGATION NO. 6:**

Over the next 21 years, Mr. Brown filled different positions in Skyline and SEA Products, and his many years of hard work and dedication to Skyline and SEA Products helped the business significantly expand its sales and customer base to numerous nation-wide outlets and thereby increased its level of success and profitability.

CHICAGO/#2942416.6

**ANSWER:**

Defendants admit that Brown held different positions at Skyline and Sea Products for over 20 years. Defendants deny the remaining allegations.

**ALLEGATION NO. 7:**

On December 29, 2014, Mr. Brown was a Sales Executive with SEA Products.

**ANSWER:**

Admitted.

**ALLEGATION NO. 8:**

Mr. Brown first became a shareholder of Skyline in 1997. At the time of his termination, Mr. Brown held 46,000 shares in Skyline, representing approximately 12% of the outstanding shares.

**ANSWER:**

Admitted.

**ALLEGATION NO. 9:**

Prior to beginning his employment at SEA Products and Skyline, Mr. Brown was diagnosed with multiple sclerosis, but he exhibited no outward signs of the condition.

**ANSWER:**

Defendants admit that Brown did not exhibit outward signs of multiple sclerosis. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

**ALLEGATION NO. 10:**

During Mr. Brown's period of employment, Defendants made no effort to provide a reasonable temperature-controlled work place despite knowing that Mr. Brown suffered from heat intolerance due to his medical condition.

**ANSWER:**

Denied.

CHICAGO/#2942416.6

**ALLEGATION NO. 11:**

Beginning in 2012 and continuing until the time of his termination, Defendant Ted Wecker and other management personnel of Skyline and SEA Products made numerous and repeated comments that Mr. Brown was "too old" and "too sick" to work.

**ANSWER:**

Denied.

**ALLEGATION NO. 12:**

Beginning in 2013 and continuing until the time of his termination, SEA Products and Skyline removed Mr. Brown from numerous customer accounts that he had developed and managed, and reassigned those accounts to other employees while assigning him less profitable accounts. This change in accounts assigned to Mr. Brown caused a reduction in Mr. Brown's perceived value and profitability, and was used as the basis to deny salary increases to Mr. Brown.

**ANSWER:**

Defendants deny that Brown worked for Skyline during 2013 or later. Defendants admit

that Sea Products assigned accounts to other sales people at Sea Products because of Brown's

continued poor performance. Defendants deny the remaining allegations.

**ALLEGATION NO. 13:**

In May 2014, Mr. Brown was diagnosed with and treated for colon cancer.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations and therefore deny them.

**ALLEGATION NO. 14:**

In May 2014, Mr. Wecker already knew Mr. Brown had multiple sclerosis. When Mr. Brown informed Mr. Wecker of his then recent diagnosis of and treatment for colon cancer, Mr. Wecker said, "I have to get you out of here." The clear implication to Mr. Brown that Mr. Wecker was looking to force Mr. Brown out of his employment before his medical conditions might worsen.

**ANSWER:**

Defendants admit that Brown told Wecker that he had multiple sclerosis prior to May 2014. Defendants deny the remaining allegations.

**ALLEGATION NO. 15:**

On December 29, 2014, Mr. Wecker informed Mr. Brown that his employment was immediately terminated. Mr. Wecker stated that Mr. Brown was "too old," "had health problems," and "had no future at Skyline."

**ANSWER:**

Defendants admit that Wecker informed Brown that his employment with Sea Products would be terminated December 31, 2014, on or about December 1, 2014. Wecker also discussed Brown's separation at the end of the year with Brown during the Summer of 2014. Defendants deny the remaining allegations.

**ALLEGATION NO. 16:**

On December 29, 2014, when Mr. Brown inquired about the buy-out of his Skyline stock, Mr. Wecker falsely stated that the stock was worth only $15 per share. When Mr. Brown asked about a valuation of the company, Mr. Wecker rejected having one conducted.

**ANSWER:**

Defendants admit that Skyline offered to repurchase Brown's shares at $15 per share. Defendants deny the remaining allegations.

**ALLEGATION NO. 17:**

Mr. Brown returned to the Skyline office on December 30, 2014. He again questioned Mr. Wecker about the value of his Skyline shares. Mr. Wecker again stated that the shares were worth only $15 per share. In an effort to convince Mr. Brown to sell his shares, Mr. Wecker promised to notify Mr. Brown of any sale of Skyline stock that occurred in the subsequent eighteen (18) months and to pay him the difference if any sale was made at a price greater than $15 per share.

CHICAGO/#2942416.6

**ANSWER:**

Defendants admit that Wecker offered, on behalf of Skyline, to repurchase Brown's shares at $15 per share. Defendants admit Skyline and Brown agreed, as part of the December 30, 2014 stock repurchase agreement (the "Stock Repurchase Agreement"), to offer an eighteen-month price guarantee (the "18-Month Price Guarantee"). The 18-Month Price Guarantee stated that "If any third party buyer or group pays more for the stock during the eighteen months, Skyline will pay you the additional amount based on the selling stock price less $75,000.00." Defendants deny the remaining allegations.

**ALLEGATION NO. 18:**

In reliance on Mr. Wecker's statements, Mr. Brown sold his stock back to Skyline for $15 per share.

**ANSWER:**

Defendants admit that Brown sold his stock back to Skyline for $15 per share, but deny the remaining allegations.

**COUNT I – FRAUDULENT MISREPRESENTATION
AGAINST SKYLINE AND SEA PRODUCTS**

**ALLEGATION NO. 19:**

Mr. Brown incorporates the allegations of Paragraphs 1 through 18 as if fully stated herein.

**ANSWER:**

Defendants have moved to Dismiss Count I.

**ALLEGATION NO. 20:**

Mr. Wecker, acting on behalf of Defendants SEA Products and Skyline, falsely represented to Mr. Brown that the value of his Skyline shares as of December 2014 was $15 per share.

**ANSWER:**

Defendants have moved to Dismiss Count I.

**ALLEGATION NO. 21:**

Mr. Wecker knew that the Skyline stock was worth greater than $15 per share, or acted in reckless disregard of whether the quoted price represented the true, fair, and reasonable value.

**ANSWER:**

Defendants have moved to Dismiss Count I.

**ALLEGATION NO. 22:**

Mr. Wecker made the false statements and representations for the purpose of and with the intent to deceive Mr. Brown and induce him to sell his Skyline shares for less than their true, fair, and reasonable value.

**ANSWER:**

Defendants have moved to Dismiss Count I.

**ALLEGATION NO. 23:**

Mr. Wecker further induced Mr. Brown to sell his shares by falsely promising to make additional payments if the Skyline stock sold at a greater price in the subsequent eighteen (18) months, knowing that he could control any such sale and thereby prevent Mr. Brown from obtaining any additional value for his shares.

**ANSWER:**

Defendants have moved to Dismiss Count I.

**ALLEGATION NO. 24:**

Mr. Brown reasonably believed Mr. Wecker's false statements and misrepresentations and relied upon them to his detriment by selling his Skyline shares at less than their true, fair, and reasonable value; had Mr. Brown not been misled, he would not have sold his interest in Skyline at $15 per share.

**ANSWER:**

Defendants have moved to Dismiss Count I.

**ALLEGATION NO. 25:**

Mr. Wecker acted willfully and with wanton disregard of Mr. Brown's rights.

-7-

**ANSWER:**

Defendants have moved to Dismiss Count I.

**ALLEGATION NO. 26:**

As a result, Mr. Brown has suffered damages, including the value of the sold shares that was not paid and remains unpaid.

**ANSWER:**

Defendants have moved to Dismiss Count I.

**COUNT II – UNJUST ENRICHMENT
AGAINST SKYLINE AND SEA PRODUCTS**

**ALLEGATION NO. 27:**

Terrence L. Brown incorporates the allegations of Paragraph 1 through 26 as if fully stated herein.

**ANSWER:**

Defendants have moved to Dismiss Count II.

**ALLEGATION NO. 28:**

By making false statements and representations to induce Mr. Brown to sell his Skyline shares for less than their true, fair, and reasonable value, Skyline and SEA Products have unjustly obtained and retained the value and benefit of the Skyline shares.

**ANSWER:**

Defendants have moved to Dismiss Count II.

**ALLEGATION NO. 29:**

Equity and good conscience require that Skyline and SEA Products pay restitution for the unpaid value of the shares wrongfully taken from Mr. Brown.

**ANSWER:**

Defendants have moved to Dismiss Count II.

CHICAGO/#2942416.6

<u>**COUNT III – BREACH OF FIDUCIARY DUTY**</u>
<u>**AGAINST TED WECKER**</u>

**<u>ALLEGATION NO. 30:</u>**

 Terrence L. Brown incorporates the allegations of Paragraph 1 through 29 as if fully stated herein.

**<u>ANSWER:</u>**

 Defendants have moved to Dismiss Count III.

**<u>ALLEGATION NO. 31:</u>**

 On information and belief, in December 2014, Defendant Ted Wecker was a major shareholder of Skyline's outstanding stock.

**<u>ANSWER:</u>**

 Defendants have moved to Dismiss Count III.

**<u>ALLEGATION NO. 32:</u>**

 In his capacity as an officer and major shareholder of Skyline, Mr. Wecker owed fiduciary duties to Skyline shareholders, including Mr. Brown. Among the fiduciary duties Mr. Wecker owed to Mr. Brown were the duties of utmost loyalty, good faith, honesty, and a duty to disclose all material facts relevant to Mr. Brown's shareholder interest.

**<u>ANSWER:</u>**

 Defendants have moved to Dismiss Count III.

**<u>ALLEGATION NO. 33:</u>**

 Mr. Wecker breached fiduciary duties owed to Mr. Brown by failing to disclose the true, fair, and reasonable value of the Skyline shares, by misrepresenting the true share value, and by acting in bad faith to induce Mr. Brown to sell his shares for less than their true value.

**<u>ANSWER:</u>**

 Defendants have moved to Dismiss Count III.

**<u>ALLEGATION NO. 34:</u>**

 Mr. Wecker acted willfully and with wanton disregard of Mr. Brown's rights.

**ANSWER:**

Defendants have moved to Dismiss Count III.

**ALLEGATION NO. 35:**

Mr. Wecker also personally benefitted from Skyline's purchase of Mr. Brown's shares because the number of outstanding Skyline shares was reduced, thereby giving Mr. Wecker a majority interest in Skyline; after this transaction, Mr. Wecker's ownership increased from 49% to almost 56% of the outstanding shares of Skyline stock.

**ANSWER:**

Defendants have moved to Dismiss Count III.

**ALLEGATION NO. 36:**

As a proximate result of Mr. Wecker's breaches of fiduciary duty, Mr. Brown has suffered damages, including the value of the sold shares that was not paid and remains unpaid.

**ANSWER:**

Defendants have moved to Dismiss Count III.

**COUNT IV – VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT (29 U.S.C. § 2601 *et seq.*) AGAINST SEA PRODUCTS**

**ALLEGATION NO. 37:**

Terrence L. Brown incorporates the allegations of Paragraph 1 through 36 as if fully stated herein.

**ANSWER:**

Sea Products incorporates its answers to Paragraphs 1-18 as if fully stated herein.

**ALLEGATION NO. 38:**

This court has jurisdiction pursuant to 29 U.S.C. § 2617(a)(2), which provides that an action under the Family and Medical Leave Act (FMLA) "may be maintained against any employer … in any Federal or State court of competent jurisdiction."

**ANSWER:**

Admitted.

-10-

**ALLEGATION NO. 39:**

SEA Products is an employer for purposes of the FMLA and at all relevant times employed over 50 persons.

**ANSWER:**

Denied.

**ALLEGATION NO. 40:**

Mr. Brown was an employee of SEA Products who, as of December 2014, had worked more than 1,250 hours of service for SEA Products during the previous 12-month period and had been continuously employed by SEA Products for more than 12 months since the commencement of his employment.

**ANSWER:**

Sea Products admits that Brown was an employee of Sea Products as of December 2014 and had been continuously employed by Sea Products for 12 months. Sea Products lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore denies them.

**ALLEGATION NO. 41:**

As a result of his diagnoses of multiple sclerosis and colon cancer at the time he was terminated on December 29, 2014, Mr. Brown would have been entitled to FMLA leave if and when either medical condition necessitated it.

**ANSWER:**

Denied.

**ALLEGATION NO. 42:**

SEA Products and, in particular, its CEO, Mr. Wecker, knew that Mr. Brown suffered from serious health conditions at the time of his termination. Despite this knowledge, on December 29, 2014, SEA Products preemptively terminated Mr. Brown because he was "too sick," and it knew or believed that Mr. Brown would likely require FMLA leave for personal medical purposes in the future.

**ANSWER:**

Denied.

**ALLEGATION NO. 43:**

SEA Products unlawfully interfered with, restrained, and denied Mr. Brown's FMLA rights in violation of 29 U.S.C. § 2615(a)(1).

**ANSWER:**

Denied.

**ALLEGATION NO. 44:**

SEA Products' actions were in willful and wanton violation of Mr. Brown's FMLA rights.

**ANSWER:**

Denied.

**ALLEGATION NO. 45:**

As a proximate result of Defendant's violations, Mr. Brown is entitled to and seeks recovery of damages under 29 U.S.C. § 2617(a) equal to the amount of back wages and employment benefits that he lost from December 29, 2014 to the present date, the amount of front wages from the present date to his retirement date, interest on all amounts at the prevailing rate, and liquidated damages as provided by statute.

**ANSWER:**

Denied.

**ALLEGATION NO. 46:**

Pursuant to 29 U.S.C. § 2617(a)(3), Mr. Brown is entitled to and seeks recovery of reasonable attorneys' fees and costs.

**ANSWER:**

Denied.

## COUNT V – ILLINOIS WAGE PAYMENT AND. COLLECTION ACT AGAINST SEA PRODUCTS

**ALLEGATION NO. 47:**

Terrence L. Brown incorporates the allegations of Paragraph 1 through 46 as if fully stated herein.

**ANSWER:**

Sea Products incorporates its answers to Paragraphs 1-18 and Paragraphs 37-46 as if fully stated herein.

**ALLEGATION NO. 48:**

At the time of his termination from his employment by SEA Products, Mr. Brown had earned but not used more than three weeks of vacation time.

**ANSWER:**

Denied.

**ALLEGATION NO. 49:**

SEA Products did not pay Mr. Brown the monetary equivalent of the earned vacation as part of his final compensation, in violation of 820 Ill. Comp. Stat. 115/5.

**ANSWER:**

Denied.

**ALLEGATION NO. 50:**

Mr. Brown is entitled to and seeks the monetary equivalent of all earned vacation as of December 29, 2014, plus damages at the statutory rate of 2% per month since his termination to the present date, plus costs and attorneys fees incurred in collecting this compensation.

**ANSWER:**

Denied.

## ADDITIONAL AND AFFIRMATIVE DEFENSES

1.     Brown's FMLA claims are barred by the applicable statute of limitations.

2.     Brown's FMLA claim fails because Sea Products would have terminated Brown's employment notwithstanding any possible need for FMLA leave.

3.     Brown's claims for damages are barred to the extent he failed to mitigate damages or already received compensation for the same loss.

4.      Brown's claims for backpay are barred to the extent he was unable to perform the functions of his job for any period or was unable to obtain employment because of his physical limitations.

## DEFENDANTS' COUNTERCLAIMS

### Introduction

Defendants and Counter-Plaintiffs Sea Products, Inc. and Ted Wecker, by and through counsel, hereby submit the following for their Counterclaims against Plaintiff and Counter-Defendant Terry Brown.

### Jurisdiction and Venue

1.      This Court has jurisdiction over Sea Products and Wecker's counterclaims pursuant to 28 U.S.C. § 1367.

2.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1)-(2), as Wecker, Brown, Sea Products all reside in this judicial district.

### Parties

1.      Sea Products is an Illinois corporation.  Sea Products functioned as a sales and marketing business.  Sea Products did not manufacture furniture.  Sea Products employed a sales and marketing staff, as well as related support functions, and placed sales of Skyline products along with sales of other entities.  Although Brown was an employee of Sea Products, he never held an equity interest in Sea Products at any time and rejected an opportunity to buy stock in Sea Products in the 1990s.

2.      Skyline is a furniture manufacturing business that was started by Wecker's father.  Skyline is an Illinois corporation and functioned solely as a manufacturer of furniture.  Skyline did not employ a sales and marketing staff, but instead contracted with Sea Products to market and sell its products.

-14-

3.      Brown held a minority equity interest in Skyline from 1997 until January 5, 2015, when Brown voluntarily agreed in writing to sell his Skyline stock back to the company. Brown was not an employee of Skyline in 2014, although he served in various officer roles for Skyline from 1997 and 2015.

### Facts Common to All Counts

4.      As an employee of Sea Products, Brown was responsible for producing sales.

5.      By at least 2013, Brown's sales productivity and general performance was not meeting Sea Products' legitimate expectations.

6.      From 2013 through his termination, Brown frequently did not come to work and spent hours a day attending to personal matters at the office. His sales numbers were significantly lower than the vast majority of other sales personnel employed by Sea Products.

7.      On December 31, 2014, Sea Products terminated Brown's employment for poor performance.

8.      In early December 2014, Wecker offered on behalf of Skyline to repurchase Brown's stock at $15 per share. Toward the end of 2014 and in 2015, Wecker also made similar offers to other minority holders of Skyline stock to repurchase their stock at $15 per share on a voluntary basis.

9.      The repurchase offer to Brown and other minority holders of Skyline stock was not mandatory. Wecker and Skyline made the offer as a way to give back to employees who held the stock by allowing them to receive a windfall profit for their stock since the price per share was far in excess of its actual value and what such stockholders had paid. Brown accepted the repurchase offer and all other minority holders accepted in 2015 at the same price per share.

10.     Brown is a sophisticated business man. He earned his bachelor's degree at the University of Denver in 1970. He is a Director of St. James Hospital and Health Centers, Inc.

-15-

and Access Healthcare. Through his employment and personal affairs, Brown had negotiated and executed numerous written contracts and agreements. Brown also had access to the Skyline financials and was aware of the minimum profitability of Skyline.

11.     Brown executed a document dated December 30, 2014, where Brown agreed to sell his 46,000 shares back to the Skyline at a price of $15 per share and for a total of $690,000.00, with half of the repurchase occurring in December 2014 and the other half on January 5, 2015. Prior to executing the Stock Repurchase Agreement, Wecker informed Brown that the repurchase offer was not mandatory and he could remain a stockholder of Skyline if he wanted to.

12.     In December 2014, Brown and Skyline negotiated and agreed to the 18-month Price Guarantee, a provision which stated that any sale of Skyline which occurred during the 18-month period after the repurchase would require Skyline to pay Brown the difference for his shares if the per share sale price exceeded $15 per share.

13.     At the time Brown agreed to sell back his shares to Skyline in December 2014, he contacted a professional accountant who gave him tax advice about structuring the stock sale to minimize his personal tax impact. Skyline agreed to structure the repurchase of Brown's shares and modified the Stock Repurchase Agreement at Brown's insistence.

14.     Brown was not denied access to any Skyline financial information which he requested. Brown executed the Stock Repurchase Agreement of his own free will and he had the resources to seek whatever professional advice he needed, and in fact did seek the advice of a professional accountant.

15.     After Brown agreed to sell his stock to Skyline for $15 per share and after Brown received payment by Skyline for his shares, Brown sent an email dated January 5, 2015 to his

-16-

friend Jerry Dyson. Brown stated in that email: "I have retired! Trying to wrap things up this week – company bought back my stock – a windfall for me."

16.    From December 30, 2014 through the present date, Skyline has not been purchased by any third party and no transfer of stock or repurchase of stock of Skyline has occurred at a per share price of more than $15 per share. Other minority holders of Skyline stock agreed to sell back their stock in 2015, but they were offered the same terms that Brown was offered and sold their stock at $15 per share.

17.    On or about December 16, 2016, Wecker transferred some of his shares of Skyline to his daughter, who is Skyline's current President. In conjunction with the transfer, Skyline received a valuation report from a qualified, independent third party. The valuation concluded that the per share value as of December 31, 2015, on a non-controlling, non-liquid basis, was $2.90 per share. The financial condition, operating results and value of Skyline did not materially change between December 31, 2014 and December 31, 2015.

18.    In July 2016—around the time of the expiration of the 18-month Price Guarantee—Brown contacted Wecker and told him that he had second thoughts about his agreement to sell back his stock to Skyline at $15 per share. Wecker told Brown that no transaction of stock or sale had occurred at a price higher than $15 per share. Wecker even offered to reverse the stock transaction and sell Brown back 46,000 shares at $15 per share, even though Skyline had no obligation to do so. However, Brown said he did not want to buy back his stock and instead complained about his separation from Sea Products.

19.    Despite agreeing in writing to sell his stock back to Skyline in December 2014, Brown began making defamatory statements about Wecker and failed to pay a debt owed to Sea Products in the amount of $47,830.00.

20.     On or about November 17, 2016, Individual A, a friend of Brown, attended an event at the County Line Orchard Banquet facility in Hobart, Indiana.  Individual B attended the same event in Hobart, Indiana.

21.     At the Hobart, Indiana event, Individual A told Individual B that Brown had told him that Wecker had defrauded Brown and "cheated him" out of his interest in Skyline.

22.     Individual A said that he was aware of or overheard similar statements by Brown to individuals at Olympia Fields County Club, where Brown is a member.

23.     Brown's statements to Individual A and others in the community impugned Wecker's reputation in the community.

## COUNT I – BREACH OF CONTRACT
## (SEA PRODUCTS AGAINST BROWN)

24.     Sea Products incorporates Paragraphs 1-23 as though fully stated herein.

25.     In September 2013, Brown orally asked Wecker and Sea Products to provide him with a loan in the amount of approximately $36,830.00 to remodel a bathroom at Brown's personal residence.

26.     Prior to September 2013, Brown had asked Wecker and Sea Products on numerous occasions to provide personal loans to him.  Sea Products provided him with loans and Brown repaid those obligations over time according to the parties' understanding.  During calendar year 2013, Sea Products provided Brown with $51,000 in cash advances.

27.     Sea Products agreed to provide Brown with the loan of $36,830.00 for the remodel of his bathroom in September 2013.  Pursuant to that oral agreement, Sea Products paid bills totaling $36,830.00 to Krohn Construction and Brown agreed to repay the $36,830.00 to Sea Products.  Brown also agreed to repay the $51,000 in cash advances, but he only repaid $40,000 of the cash advances prior to his separation.

-18-

28.     Brown's agreement with Sea Products constituted a binding contract.

29.     Sea Products has performed all of its obligations under the contract.

30.     Brown breached that contract by failing to repay the $11,000 in cash advances and $36,830.00 paid to by Sea Products Krohn Construction on Brown's behalf.

31.     As a result of Brown's breach, Sea Products has suffered damages in the amount of $47,830.00, and related costs.

WHEREFORE, Defendant Sea Products seeks the following relief:

(a)     A judgment in favor of Sea Products stating that Brown breached his agreement with Sea Products;

(b)     Breach of contract damages equal to $47,830.00;

(c)     pre-judgment interest;

(d)     All other relief this Court deems just and proper.

### COUNT II – UNJUST ENRICHMENT
### (SEA PRODUCTS AGAINST BROWN)

32.     Sea Products incorporates Paragraphs 1-31 as though fully stated herein.

33.     In the alternative to Count I, Sea Products alleges this claim for unjust enrichment.

34.     Plaintiff received $47,830.00 in cash advances and construction remodeling services for the bathroom in the personal residence of his home.

35.     Plaintiff did provide any compensation of services in exchange for the cash advance or remodeling services he received.

36.     Sea Products gave $51,000.00 in cash payments to Brown as loans, of which $11,000 was never repaid. Sea Products also paid for the $36,830.00 in construction remodeling services for the bathroom in the personal residence of Brown's home in September 2013.

37.     Plaintiff has retained the benefit off $47,830.00 in cash and construction remodeling services without paying for those services or reimbursing Sea Products for its payment of those services or cash advances.

38.     Plaintiff's retention of the benefit of the cash advances and home remodeling services without reimbursing Sea Products caused a detriment to Sea Products.

39.     Plaintiff's retention of the benefit of the home remodeling services without reimbursing Sea Products violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, Defendant Sea Products seeks the following relief:

(a)     A judgment in favor of Sea Products with respect to its claims of unjust enrichment;

(b)     An order requiring Brown to pay Sea Products $47,830.00;

(c)     Costs and pre-judgment interest;

(d)     All other relief this Court deems just and proper.

### COUNT III – DEFAMATION *PER SE* (WECKER AGAINST BROWN)

40.     Sea Products incorporates Paragraphs 1-39 as though fully stated herein.

41.     Brown's statements to Individual A and others in the community constitute defamation *per se.*

42.     Brown's statements were made to a third party other than Wecker.

43.     Brown made the defamatory statement knowing that the statement was false and that, in fact, Brown had received a "windfall" payment when he sold his stock back to Skyline.

44.     Brown's statement amounts to defamation *per se* because his statements impute: the commission of a crime or a criminal offense (i.e., fraud); a lack of integrity in the discharge

of Wecker's office and employment with Skyline; and a lack of ability in Wecker's trade, profession or business.

WHEREFORE, Defendant Ted Wecker seeks the following relief:

(a)     A judgment in favor Wecker that Brown's comments amount to defamation *per se*;

(b)     Damages equal to at least $500,000.00, and

(c)     Attorney's fees, costs, and pre-judgment interest.

(d)     All other damages and relief the Court deems appropriate.

Dated:  February 22, 2017                 Respectfully submitted,

                                          SKYLINE FURNITURE
                                          MANUFACTURING, INC., SEA
                                          PRODUCTS, INC., and TED WECKER


                                          By:  /s/ Patrick W. Spangler

Randall M. Lending
Patrick W. Spangler
Martin T. McElligott
Vedder Price P.C.
222 North LaSalle Street, Suite 2600
Chicago, Illinois  60601-1003
T:  +1 (312) 609-7500

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing DEFENDANTS' ANSWER TO

COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing to the following on

February 22, 2017:

Thomas A. Smith
Douglas W. Michaud
Senak Keegan Gleason Smith & Michaud, Ltd.
621 S. Plymouth, Suite 100
Chicago, Illinois  60605

Robert B. McMonagle
Lane & Waterman, LLP
220 N. Main Street, Suite 600
Davenport, IA  52801

/s/ Patrick W. Spangler

-22-